IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
MIDDLE DIVISION

DONNA HAYNES,                          )
ADMINISTRATRIX FOR THE ESTATE          )
OF PHILLIP CORLEY, deceased,           )
                                       )
            Plaintiff,                 )
                                       )
v.                                     )       Civil Action No.: 02-PT-0813-M
                                       )
CITY OF CROSSVILLE, ALABAMA,           )
a municipality,                        )
                                       )
            Defendant.                 )

## MEMORANDUM OPINION

This cause comes on to be heard upon defendant City of Crossville's ("the City") Motion

for Summary Judgment, filed on April 15, 2003.

### FACTS AND PROCEDURAL HISTORY[1]

Plaintiff Donna Haynes ("Haynes") is the duly qualified and acting Administratrix of the

Estate of Phillip Corley ("Corley"). The City is a municipal entity that operates and maintains

the Crossville City Jail ("the Jail"). This lawsuit involves the events surrounding the arrest and

death of Corley while incarcerated in the Jail.

### I. Corley's History of Mental Illness

Haynes, Corley's mother, testified that at the end of October 2001 she took Corley to

Mountain View Hospital, a psychiatric facility in Gadsden, after he had suffered some emotional

problems and been referred there by emergency room personnel at the Cherokee Hospital in

Centre. *See* Def. Ex. 8 at 57-63. Corley stayed at Mountain View Hospital for several days and

---

[1]The statement of facts and summary of the parties' arguments may overlap somewhat.

left on November 2 or 3, 2001. *Id.* at 66. Corley informed the staff that he had a substance

abuse problem, and he received treatment for that problem. *See* Pl. Ex. 4 at 20-21. However, he

left without being discharged. *See* Def. Ex. 8 at 66-67. He took no medications with him. *Id.* at

71. Haynes testified that, prior to being admitted at Mountain View Hospital, Corley had been

taking antidepressant medication that was prescribed to her, and that he began taking the

medicine again after he left. *Id.* at 74-75. Haynes testified that as far as she knew, Corley did

not have any medicines prescribed to him after he left Mountain View Hospital. *Id.* at 75. Nor

did he ever see any further healthcare providers about these psychiatric problems. *Id.* Haynes

testified that until she received a call from the Jail, she did not know that Corley was still taking

medication. *Id.* at 85. Even then, she did not know for sure whether it was her medication. *Id.*

at 91.

## II. Corley's Incarceration

On January 23, 2002, Corley was arrested by Cherokee County Sheriff's deputies on a

charge of issuing a bad check. *See* Pl. Ex. 13 (arrest report). A warrant had been issued for

Corley's arrest in November of 2001. *Id.* (warrant). Corley was picked up at the Cherokee

County Sheriff's Office and transported to the Jail on the night of January 23, 2002. *See* Def.

Ex. 2 at 23. As will be discussed below, Officer Christ West ("West"), who picked Corley up,

did not obtain a copy of the booking sheet filled out by Cherokee County. *See* Pl. Ex. 6 at 25-26.

Corley was booked into the Jail and was allowed to call his mother in the nearby town of Sand

Rock to let her know that he was there. *See* Def. Supp. Ex. 2 at 16. Officer Christ West, who

transported Corley to the Jail, stated that he received no documentary information about Corley

from the Cherokee County Sheriff's Office. *See* Def. Ex. 2 at 30-31.

2

Corley was incarcerated at the jail from January 23, 2002 until his death on January 28, 2002. According to the City, the jail logs for January 23 and January 24 show that Corley's stay was uneventful. *See* Def. Supp. Ex. 1 at 12, 25-26. The jail logs for January 25 show that at 9:30 a.m. Corley's mother brought him clothes and toiletries, and that she visited with Corley for a few minutes. *Id.* at 13; Def. Ex. 8 at 106.[2] Later, Corley requested that the dispatcher call a drug enforcement agent in Cherokee County because Corley needed to speak with him. *See* Def. Supp. Ex. 1 at 13. The log further shows that, after lunch that day, Corley became upset and wanted a cigarette, at one point screaming an expletive. *Id.* Corley was told that he would have to wait for an officer to take him outside. According to the City, from that point until the morning of January 28, the jail logs show that Corley's incarceration was uneventful.

On the morning of January 28, the jail logs show that Corley told the dispatcher that he wanted to telephone Haynes in order for her to bring him medication. *See* Def. Supp. Ex. 1 at 20. The log also shows that the dispatcher did call Haynes, and that she responded that she would bring medication and post bond for Corley that day. *Id.* Later that day, Corley's fiancée came by and visited him. *Id.* She later called and told the dispatcher that Corley's grandparents were getting the money together to bail him out of jail. *Id.* The log for the next shift on that day shows that at 4:30 p.m. Corley was lying down and quiet. *See* Def. Supp. Ex. 1 at 27. According to the City, when the dispatcher went back at 5:45 p.m. to ask Corley what he wanted for supper, she found that Corley had hanged himself in his cell. *Id.*

---

[2]Apparently, Corley had "messed himself" [soiled his pants]. *See* Def. Ex. 8 at 106. Police Chief Priest testified that such behavior would be a cause for concern, and that "we'd keep a closer eye on [the prisoner] and make sure [he] didn't do anything else. *See* Pl. Ex. 2 at 29-30. Priest defined a "closer eye" as "[i]nstead of every fifteen to thirty minutes every few minutes there would be a dispatcher back there checking on" the prisoner. *Id.* at 30. The court has seen no evidence that this was ever done.

3

### III. Training and Procedures at the Jail

Crossville Police Chief Chuck Priest ("Priest") was trained at the Northeast Alabama Police Academy in 1983. He has worked in law enforcement in Geraldine, Boaz, and then for about 17 years in Crossville. *See* Def. Ex. 1 at 29-34. Priest admitted that he had received no formal training in prisoner intake or care, other than instruction that they are to be treated humanely. *Id.* at 34. Nor was there any formal training for Crossville's police officers or dispatchers relating to prisoner care prior to Corley's death. *Id.* at 53 ("complete lack of a training program")(Video Depo.). *See also* Def. Ex. 5 at 14; Pl. Ex. 1 at 48-49 (Priest stating that dispatchers "need training just like the officers do"). Haynes notes that Peggy McClendon, who was the dispatcher on duty when Corley died, stated that she had received no training on how to care for a prisoner or how to determine if a prisoner was a danger to himself. *See* Pl. Ex. 5 at 10-11. *See also* Pl. Ex. 6 at 35-36 (West's lack of training); Pl. Ex. 7 (Clayton's lack of training); Pl. Ex. 8 at 13 (Towns' lack of training). However, according to the City, no other prisoner had ever hanged himself, nor had any prisoner ever hurt another prisoner or employee at the jail. *See* Def. Ex. 1 at 54 (Video Depo.).

Haynes also points to the written policies and procedures of the Jail at the time of Corley's death. *See* Pl. Ex. 12. Haynes offers the testimony of Professor Kenneth Barnes ("Barnes"), who she purports is an expert in this area.[3] Barnes stated that the Jail's policies are deficient, in that they fail "to address suicide prevention, medical screening, or detention officer

---

[3]The City has filed a Motion to Strike the affidavit of Barnes. The City argues that since deliberate indifference is a subjective state of mind, *see Farmer v. Brennan*, 511 U.S. 825 (1994), Barnes' opinions on deliberate indifference are without foundation and are irrelevant. The City also argues that the affidavit is conclusory. Haynes counters that Barnes' opinions go to the objective prong of the deliberate indifference standard, and are thus admissible. Also, the affidavit is not conclusory as it is based on the facts of the case, which are cited in the affidavit.

responsibility toward potential suicides." Barnes Aff. at ¶ 10. Barnes also opined that these

policies and procedures violated the standard of care owed to prisoners. *Id.* Haynes also notes

that Priest could not recall if he had ever seen the Jail's policies and procedures, and that he

stated that, in his seventeen years with the City, no one had ever told him that the Jail's policy

was to check a prisoner at least every hour. *See* Pl. Ex. 2 at 34-35; Pl. Ex. 1 at 51-52.

Next, Haynes points out that the City and/or the Jail did not utilize a "booking sheet" at

the time of Corley's arrest. Barnes stated that the purpose of a booking sheet (or intake sheet)

"is to enable the municipality that is taking custody of the prisoner to determine, among other

things, whether the prisoner presents a risk of harm to himself or to others . . . suffers from

mental illness, or suffers from drug addiction." Barnes Aff. at ¶ 6. Priest admitted that the Jail

did not use booking sheets. *See* Pl. Ex. 1 at 44-45. Indeed, he stated that "[h]ad they been in use

at that time, then we would have knowledge of his illness and we would have made some

arrangements to either get him the medication he needed or, you know, have the parents [do] . . .

whatever they needed to do." *Id.*; *see also* Pl. Ex. 1 at 72-73. Cherokee County did fill out a

booking sheet on Corley when he was arrested, and that sheet noted his mental illness, drug

addiction, and treatment at Mountain View Hospital. *See* Pl. Ex. 6 at 25-26; Pl. Ex. 1 at 74; Pl.

Ex. 11. Priest stated that they would have handled Corley differently if they had had the

Cherokee County booking sheet in front of them, noting that the Jail was not "trained to handle

someone with a mental problem." *See* Pl. Ex. 1 at 75, 77-81, 85. *See also* Pl. Br. at 6-7.

At the time of Corley's incarceration, jailers/dispatchers were to check on inmates once

every 30 minutes to one hour. *See* Def. Ex. 1 at 33 (Video Depo.). The jailer/dispatcher at the

Crossville jail is charged with keeping the police log, answering police calls, dispatching police

and other rescue personnel, and also checking on the inmates at the jail. *See* Def. Ex. 3 at 10.

At the time of Corley's death, a camera monitor, which looked down the hall toward the jail cells, was not working. *See* Def. Ex. 3 at 16. The City does not know how long the camera had been out. *Id.* Debbie Bruce, the town clerk, could not recall if the monitors had been working at any time during the entire year prior to Corley's incarceration. *See* Pl. Ex. 9 at 59. Haynes notes that no justification has been given as why the camera was out, and also notes that the day after Corley hanged himself, the Jail ordered four new cameras and a new monitor for the dispatcher's office. *See* Pl. Ex. 9 at 77-79; Pl. Ex. 10.

**IV. Corley's Demeanor While at the Jail**

Corley's fiancée, Misty Shankles ("Shankles"), testified as to Corley's demeanor at the Jail. Shankles did not see Corley until January 28, although she did state that Haynes had told her that the Jail had called asking about Corley's medication. *See* Def. Ex. 6 at 57-58. Shankles testified that the medicine at issue was a "Zoloft" prescription which had been prescribed to Haynes. *Id.* at 59. Shankles had the pills with her when she went to see Corley. *Id.* at 66. Shankles stated that Corley was pacing back and forth and was "antsy." *Id.* Corley believed that the Jail would not let him have the medicine, telling Shankles that "I done asked them to get you or mom to bring it down here, and they won't let me have it." *Id.* at 67. However, Shankles testified that she had no knowledge about whether Corley had discussed his medicine with the Jail. *Id.* at 73. She also stated that she neither asked anyone about the medication, nor attempted to leave it with anyone at the Jail. *Id.* at 67-68. Nor did she tell anyone about his pacing back and forth. *Id.* at 75. After discussing Corley's bail situation, Shankles stated that he seemed fine, and that she believed that "in his head he knew that he was getting out the next morning."

6

*Id.* at 68-69.  She also stated that her visit with Corley was a pleasant one.  *Id.* at 69.  After again

speaking with Haynes, Shankles called the Jail and asked them to inform Corley that the bail

money was on the way and that he would be out soon.  *Id.* at 73.

Haynes also offered testimony about Corley.  On the night that he was arrested, Corley

called Haynes but did not ask about his medicine.  *See* Def. Ex. 8 at 97.  Haynes testified that

Corley did not sound like he was "in another world like he was" the night that he went to the

emergency room.  *Id.*  In fact, Corley asked Haynes about Shankles, who had also been arrested.

*Id.* at 97-98.  On Friday, January 25, Haynes went to the Jail to bring Corley a change of clothes.

*Id.* at 106, 118-19.  Haynes described Corley's demeanor as not mad, but more hyper.  *Id.* at 120.

She also said that Corley was pacing and that he wanted her to get him out of jail.  *Id.*  Corley

asked Haynes to speak with Joey Hester, a drug task force agent.  *Id.* at 112.  Haynes also stated

that when the Jail called her the second time, this time asking about Corley's medicine, she

responded by saying that she did not have any medicine for him.  *Id.* at 143.  She stated that the

man that called her "was really nice, and he was concerned."  *Id.*  Haynes also asserts that she

was called on Sunday, January 27, also about Corley's medicine.  *Id.* at 85, 88.  Finally, Haynes

testified that Shankles did not leave the medicine at the Jail for Corley because it was in her

(Haynes) name.  *Id.* at 157.

By contrast, the City argues that none of the persons at the Jail noticed anything about

Corley that would make them think that he wanted to harm himself.  *See, e.g.,* Def. Ex. 1 at 60-

61 (Video Depo.); Def. Ex. 2 at 13-14, 29.  Specifically, Priest testified that he never saw Corley

fidgeting or babbling, nor did he see any scars or signs of self-inflicted wounds.  *See* Def. Ex. 1

at 61 (Video Depo.).  Priest did state that Corley once became "unruly," which he described as

"loud" and "hollering," wanting to smoke a cigarette. *Id.* at 25-26 (Video Depo.). However, once Priest took him outside to smoke, Corley calmed down. *Id.* Priest stated that he was never informed of any of Corley's problems, mental or otherwise. *Id.* at 27 (Video Depo.).

Similarly, Kristie Towns ("Towns"), a dispatcher at the Jail, testified that Corley's behavior was "okay," while he was at the jail, although she did note that Corley did get a "little irate" about wanting to smoke a cigarette. *See* Def. Ex. 3 at 13. Corley was yelling and cursing about not getting a cigarette, but Towns testified that he later apologized for his conduct. *Id.* Towns worked from 8:00 a.m. to 4:00 p.m. on January 28, 2002, the date that Corley died. *Id.* at 15. That morning, Corley asked Towns to call his mother and ask her to bring his medication. *Id.* at 31. Haynes, Corley's mother, told Towns that she would bring the medication and get him out "in a little bit." *Id.* Towns made no inquiry as to what kind of medication Corley was taking. *Id.* Towns checked on Corley at 1:00 p.m., after lunch, and noticed nothing unusual. *Id.* at 55. Towns again checked on Corley at 2:00 p.m., reporting that he was fine. *Id.*; Def. Supp. Ex. 3 at 20. At 2:25 p.m., Shankles came to visit him, leaving at 2:57 p.m. *See* Def. Ex. 3 at 35. After Shankles left, Towns checked on Corley, noting that he was awake and fine. *Id.* at 36. Apparently, this is the last time that Towns saw Corley.

Haynes points to other facts surrounding Towns' conduct. According to Hayes, the jail logs for January 28 show that Towns checked on Corley at 11:00 a.m., but that she did not check him again until 1:00 p.m. *See* Pl. Ex. 15. Lunch was served to Corley at 12:00 p.m. by Kristy Kerr ("Kerr"), an inmate at the Jail. *Id.*; Pl. Ex. 2 at 51. Kerr, however, did not have authority to check prisoners. *See* Pl. Ex. 2 at 51. Towns did not check Corley at 12:00 p.m. *See* Pl. Ex. 8 at 33. Priest testified that it was a violation of Jail policies to have Kerr check on a prisoner. *See*

8

Pl. Ex. 2 at 36. Towns testified that she relied on Kerr to tell her about Corley's condition. *See* Pl. Ex. 8 at 58-59. She also stated that, if she had checked on Corley at 12:00 p.m. and had seen him pacing, babbling, etc., it would have been noteworthy. *Id.* at 58. Finally, Haynes notes that at 8:00 a.m on January 28, Towns noted in the log that Corley asked her to call Haynes about his medication. *See* Pl. Ex. 15. According to Haynes, this is at least the third time that someone at the Jail knew that Corley needed his medication. Towns did not ask Corley what the medication was for. *See* Pl. Ex. 8 at 31.

Dispatcher Peggy McClendon ("McClendon") began her shift at 4:00 p.m. on January 28, 2002. *See* Def. Ex. 4 at 21. According to McClendon, Corley, prior to January 28, was very quiet and caused no trouble. *Id.* at 14. McClendon never even had problems with Corley regarding cigarettes. *Id.* at 15. She never saw him pacing, fidgeting, babbling, or exhibiting any other behavior that was not typical of prisoners. *Id.* at 34-35. McClendon checked on Corley at 4:00 p.m. on January 28, 2002. *Id.* at 21. She checked on him again at 4:30 p.m. *Id.* McClendon did not check on him again until 5:45 p.m., at which point she found Corley hanging in his cell. *Id.* McClendon testified that at 5:31 p.m., she received a call from an officer on patrol. *See* Def. Ex. 4 at 25-26. McClendon stated that it was Jail policy for the dispatcher not to leave the radio until the officer reports back that all is clear. *Id.* at 41-42.

Haynes counters by noting that the call was not received until 5:31 p.m., which she argues means that McClendon should have already checked on Corley before the call came in, presumably at 5:30 p.m. McClendon also testified that she did not remember the call taking

more than a couple of minutes. *See* Pl. Ex. 5 at 27.[4] McClendon stated that when she found

Corley, his neck was not extended nor were his feet on the ground. *Id.* at 37-39. However, a

photograph of Corley shows his neck severely extended. *See* Pl. Ex. 19. Thus, Haynes asserts,

there is an inference that Corley has just recently hanged himself when McClendon found him.

Officer Jacky Clayton ("Clayton") is a police officer with the City. *See* Def. Ex. 5 at 9.

Clayton had prior experience as a dispatcher, and testified that dispatchers checked on prisoners

approximately once every hour. *Id.* at 14. Clayton testified that he had contact with Corley on

only one occasion, that being when he escorted Corley outside for a smoke break. *Id.* at 19. The

City contends that this incident occurred on January 26, 2002. After Clayton took Corley

outside, Corley began telling Clayton about his problems before being arrested. *Id.* at 20-21.

Corley also told Clayton that he had suffered a nervous breakdown. *Id.* at 21-24. Clayton did

not call a mental health official. *Id.* Clayton did testify that he is told these kinds of things all

the time, although he admitted that he may not routinely be told about nervous breakdowns. *Id.*

at 23. Clayton also testified that Corley was not acting "out of touch," nor did he do anything

that would suggest that he might harm himself. *Id.* at 39. Haynes contends that there is also

some evidence that Corley said something to Clayton about Haynes bringing him some

medicine. *See* Pl. Ex. 20 at ¶ 11 (interrogatories); Pl. Ex. 21 at ¶ 11 (responses).

Haynes filed this lawsuit on March 29, 2002. Haynes alleges violations of 42 U.S.C. §

1983 (Count I) and the Alabama Wrongful Death Statute (Count II). *See* Am. Compl. at 4-6.

She also alleges negligent/wanton hiring, training, supervision, and retention (Count III), and a

---

[4]Apparently, there is some ambiguity as to when this call ended. McClendon stated that when she found Corley, at 5:45 p.m., she ran up the hall and told Officer Clayton. *See* Pl. Ex. 5. However, Clayton was the officer that made the 5:31 p.m. call to dispatch. Thus, at most, the call took fourteen minutes. However, Haynes notes that there is no documentary evidence to support exactly when this call ended. *See* Pl. Br. at 12-13.

general claim of negligence/wantonness (Count IV). *See* Am. Compl. at 6-8.[5] Haynes seeks

compensatory and punitive damages, as well as attorney's fees. The City now seeks summary

judgment as to all claims.

## SUMMARY JUDGMENT STANDARD

Summary judgment may be granted based upon facts developed through pleadings,

discovery, and supplemental affidavits, etc., if together, they show that there is no genuine issue

as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-323 (1986). A dispute is

genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party moving for

summary judgment bears the initial burden of explaining the basis of his motion. *Celotex*, 477

U.S. at 323. "It is never enough [for the movant] simply to state that the non-moving party could

not meet their burden at trial." *Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000)

(quotation omitted). The non-moving party then bears the burden of pointing to specific facts

demonstrating that there is a genuine issue of fact for trial. *Celotex*, 477 U.S. at 324. The non-

moving party "must either point to evidence in the record or present additional evidence

'sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary

deficiency.'" *Hammer v. Slater*, 20 F.3d 1137, 1141 (11th Cir. 1994) (quotation omitted).

Summary judgment is required where the non-moving party merely repeats its conclusory

allegations, unsupported by evidence showing an issue for trial. *Comer v. City of Palm Bay,* 265

F.3d 1186, 1192 (11th Cir. 2001) (citation omitted).

Summary judgment will not be granted until a reasonable time has been allowed for

---

[5]Haynes also alleged a count of *respondeat superior* (Count V). *See* Am. Compl. at 9. The court assumes that this is a theory of liability and not a separate count.

11

discovery. *Comer*, 265 F.3d at 1192. Moreover, "[w]hen deciding whether summary judgment

is appropriate, all evidence and reasonable factual inferences drawn therefrom are reviewed in a

light most favorable to the non-moving party." *Korman v. HBC Florida, Inc.*, 182 F.3d 1291,

1293 (11th Cir. 1999). Finally, the trial court must resolve all reasonable doubts in favor of the

non-moving party, although it need not resolve all doubts in a similar fashion. *Earley v.*

*Champion Int'l Corp.*, 907 F.2d 1077, 1080 (11th Cir. 1990).

## ARGUMENTS

### I. 42 U.S.C. § 1983 (Count I)

#### A. Defendant's Position

The City argues that in order to recover in an inmate suicide case, the plaintiff must show

that the jail official acted with "deliberate indifference." *Williams v. Lee County*, 78 F.3d 491,

493 (11th Cir. 1996). To establish deliberate indifference, the jail official must have had notice

of a "'strong likelihood, rather than a mere possibility,' of *the* particular decedent's suicidal

tendencies." *Id.* at 493 (citation omitted)(emphasis added). According to the City, absent

knowledge of a detainee's suicidal tendencies, the failure to prevent a suicide has never been

held to be deliberate indifference. *See, e.g., Haney v. City of Cumming*, 69 F.3d 1098 (11th Cir.

1995)("The deliberate indifference standard is a subjective one, requiring that a defendant know

of and disregard an excessive risk to an inmate's health or safety."); *Popham v. City of*

*Talladega*, 908 F.2d 1561, 1564 (11th Cir. 1990)("In the context of jail suicides, an allegation of

deliberate indifference must be considered in light of the level of knowledge possessed by the

officials involved, or that which should have been known as to an inmate's suicidal

tendencies.").

As to training, the City argues that it must have had actual or constructive knowledge that the particular omission was substantially certain to result in the violation of the constitutional rights of its citizens. *See City of Canton v. Harris*, 489 U.S. 378 (1989). A need for a particular type of training may be obvious where jailers face clear constitutional duties in recurring situations. *See Young v. City of Augusta*, 59 F.3d 1160 (11th Cir. 1995). Also, the City argues, the need for more or better training may be obvious where a pattern of violations exist such that the municipality knows or should know that corrective measures are needed. *See Belcher v. City of Foley*, 30 F.3d 1390 (11th Cir. 1994).

The City contends that, even construed in the light most favorable to Haynes, there is no evidence that any of the jailers, police officers, or other city officials had any indications that Corley would commit suicide. No person had ever committed suicide at the Jail, nor had any inmate hurt another inmate or Jail employee. Thus, the City argues, there is no evidence that it knew that there were problems with the policies, training, etc. at the Jail.

Nor can it be said that Corley did anything to give the jailers reason to know that there was a strong likelihood that Corley would commit suicide. The records show that Corley's time at the jail was relatively uneventful, with the possible exceptions of his outbursts regarding cigarettes. Even Shankles stated that on the morning of January 28, Corley seemed fine. Corley was checked at 4:00 and 4:30 p.m. on the day that he died, and the only reason that he was not checked again until 5:45 p.m. was because McClendon had to answer a call at the dispatch station. As soon as the officer returned, the City notes, McClendon went to check on Corley. With respect to Corley's medication, the City notes that it is undisputed that the prescription was in Haynes' name. Thus, it is doubtful, even assuming that the jailers knew about the medication,

13

that they would have allowed him to have access to it because it was not in his name. Moreover, there is no evidence that the jailers knew what kind of medicine it was, what it was used for, or why Corley should be allowed to take it without a prescription.

All that these facts establish, the City argues, is that there was a small-town jail in which the jailers checked on the inmates every thirty minutes to an hour. There is simply no evidence that the jailers knew or had reason to believe that Corley might kill himself.

B. Plaintiff's Response

Haynes counters that inadequate training of employees may constitute deliberate indifference for purposes of § 1983. *See City of Canton*, 489 U.S. at 388 ("We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.). If the municipality's polices are the "moving force" behind a constitutional violation, Haynes asserts, the municipality can be held liable. *Id.* at 388-89. Liability can attach when " a deliberate choice to follow a course of action is made from among various alternatives by city policymakers." *Id.*

According to Haynes, the focus is on "whether that training program is adequate; and if it is not, the question becomes whether such inadequate training can justifiably be said to represent 'city policy.'" *Id.* at 390. In other words, "it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.* If this occurs, "the failure to provide proper training may fairly be said to represent a policy for which

14

the city is responsible, and for which the city may be held liable if it actually causes injury." *Id.* Haynes also asserts that the focus is not properly on the training of a particular officer, but rather on the "adequacy of the training program in relation to the tasks the particular officers must perform." *Id.*

In this case, Haynes contends, it is undisputed that the City completely lacked a training program for its dispatchers/jailers in areas of prisoner evaluation, prisoner care, and prisoner monitoring. Haynes's expert asserts that the City's procedures "fail to address suicide prevention, medical screening, or detention officer responsibility toward potential suicides." Barnes Aff. at ¶ 10. Haynes contends that, if a proper training regiment had been in place, the jailers/dispatchers would have recognized the significance of Corley soiling himself, asking for medication, asking to speak with a drug enforcement agent, and his telling Clayton that he had suffered a nervous breakdown. A jury could find that the City's failure to train was the "moving force" behind the violation of Corley's constitutional rights.

Morever, Haynes argues, the City had actual knowledge that Corley presented a substantial risk of self-inflicted harm. Haynes agrees that a plaintiff must establish that the decedent demonstrated a strong likelihood, rather than a mere possibility, of suicide. *See Tittle v. Jefferson County Comm'n*, 10 F.3d 1535, 1540 (11th Cir. 1994)(*en banc*). The City knew that Corley has soiled himself, which Priest admitted should have led the City to check on him "every few minutes." *See* Pl. Ex. 2 at 29-30. The City knew that Corley was asking to speak to a drug enforcement agent, and that he had asked for medication on numerous occasions. Perhaps most importantly, Corley told Clayton that he had recently suffered a nervous breakdown. Haynes contends that the failure of a staff member to notify competent officials of an inmate's dangerous

15

psychiatric state can constitute deliberate difference. *See Waldrop v. Evans*, 871 F.2d 1030, 1036 (11th Cir. 1989).

Haynes also notes that the City did not utilize bookings sheets, that the monitor and camera at the Jail were not working, and that no one at the Jail ever inquired as to what medication Corley was taking. On that latter point, Haynes contends that whether or not the prescription was in Corley's name is irrelevant. The relevant fact is that he was taking an anti-depressant. Haynes contends that these facts contributed to the City's failure to learn the truth about Corley's condition.

Finally, Haynes points to the expert testimony of Barnes. Haynes notes that expert testimony can offer guidance on a disputed factual issue of whether a defendant acted with deliberate indifference. *See Greason v. Kemp*, 891 F.2d 829, 835-40 (11th Cir. 1990). Barnes pointed to several facts which he opines constitutes deliberate indifference, including the failure to utilize a booking sheet or obtain a copy of Cherokee County's booking sheet and the Jail's inadequate training and policies. *See* Barnes Aff. at ¶¶ 8-10. Barnes also stated that, under these facts, "Crossville gained actual knowledge that Mr. Corley presented an excessive risk of self-inflicted harm." *Id.* at ¶ 12.

C. Defendant's Reply

The City contends that it cannot be liable for a violation of § 1983 under a theory of *respondeat superior*. Rather, Haynes must show "an objectively serious need, an objectively insufficient response to that need, subjective awareness [by the City, through its police chief], of facts signaling the need, and an actual inference of required action from those facts." *Taylor v. Adams*, 221 F.3d 1254, 1258 (11th Cir. 2000). In other words, the City argues, Priest would

have had to know facts and actually drawn an inference that there was strong likelihood, rather than a mere possibility, that (1) Corley would commit suicide, and (2) that the policies of the Jail would lead to his suicide.

As to Haynes expert testimony, the City contends that it does not prove what Priest's subjective mental intent was, or that he drew any inference that his actions or his policies would result in the strong likelihood of suicide. *See Campbell v. Sikes*, 169 F.3d 1353, 1364 (11th Cir. 1999)("[A]n official's failure to alleviate a significant risk that he should have perceived but did not, while no cause for commendation, cannot under our cases be condemned as the infliction of punishment.")(citing *Farmer v. Brennan*, 511 U.S. 825, 837-38 (1994)).

## II. Alabama Wrongful Death Statute (Count II)

### A. Defendant's Position

The City contends that under Alabama law, forseeability of a decedent's suicide is significant "only if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt." *Popham v. City of Talladega*, 582 So. 2d 541, 543 (Ala. 1991)(citation omitted). Here, the City contends, there is simply no evidence that the jailers had any knowledge of Corley's suicidal proclivities. Moreover, the City argues, it is entitled to discretionary immunity under Alabama Code § 6-5-338(b). The City contends that decisions on how to handle the incarceration of inmates is a matter of discretion to be exercised by government officials.

### B. Plaintiff's Response

Haynes counters that recovery for suicide is appropriate when "the defendants reasonably

should have anticipated that the deceased would attempt to harm himself." *Popham*, 582 So. 2d at 543. Haynes agrees with the City that forseeability is legally sufficient "if the deceased had a history of suicidal proclivities, or manifested suicidal proclivities in the presence of the defendant, or was admitted to the facility of the defendant because of a suicide attempt." *Keeton v. Fayette County*, 558 So. 2d 884, 887 (Ala. 1989). Forseeability is "a matter of probabilities, not of certain prediction." *Foster v. Charter Med. Corp.*, 601 So. 2d 435, 440 (Ala. 1992). As noted above, the City knew that Corley had soiled himself, had requested medication, had requested to speak with a drug enforcement agent, and had told Clayton that he had suffered a nervous breakdown. He also told the Cherokee County officers that he suffered from mental illness. These facts, Haynes argues, constitute forseeability.

Haynes also distinguishes the cases relied upon by the City. In *Tittle*, Haynes argues, the decedent had expressly denied a history of mental or emotional illness, and he never manifested any suicidal tendencies. *See Tittle*, 597 So. 2d at 681. By contrast, Corley did manifest suicidal tendencies, and he informed officers of his mental illness (Cherokee County) and nervous breakdown (Clayton). In *Popham*, 582 So. 2d 541, the decedent was under constant 24-hour closed-circuit television. *Id.* at 543. Here, that was not the case. Indeed, according to Haynes, the Alabama Supreme Court has found that the combination of no monitor, a broken intercom system, and no personal observation was enough to defeat summary judgment. *See Keeton v. Fayette County*, 558 So. 2d 884 (Ala. 1989).

Lastly, Haynes argues that the City is not entitled to any immunity. First, she notes that since she has alleged "neglect, carelessness or unskillfulness," she has stated a cause of action under Alabama Code § 11-47-190 (municipal liability). Second, Haynes contends, the immunity

18

provision cited by the City applies only to "peace officers," which she argues does not include

the dispatchers/jailers responsible for monitoring Corley. *See* Ala. Code § 6-5-338(a)

(describing "peace officer"). Third, § 6-5-338 only provides immunity to the municipal agents,

not the municipality itself. *See Hardy v. Town of Hayneville*, 50 F. Supp. 2d 1176 (M.D. Ala.

1999)("The Alabama Supreme Court has limited its reliance on section 6-5-338 to claims against

individual peace officers. The court is unaware of any case in which a court applying Alabama

law extended statutory discretionary function immunity to a municipality itself, in addition to its

peace officers.). Finally, Haynes argues, to the extent that West and Clayton (who are police

officers) were involved, they were not performing discretionary functions. Haynes cites *Defoor*

*v. Evesque*, 694 So. 2d 1302 (Ala. 1997), in which the court stated that there was no immunity

because "[t]his defendant's function clearly required due care rather than difficult decision

making." *Id.* at 1305 (quoting and discussing *DeStafney v. Univ. of Ala.*, 413 So. 2d 391 (Ala.

1981)). Likewise, Clayton and West were exercising due care, not difficult decision making.

### III. Negligent Training/Supervision/Retention and General Negligence (Counts III & IV)

Although the City's motion appears to seek summary judgment on all claims, it did not

address these two counts in its brief. Haynes noted this fact in her response, but likewise did not

specifically address these two counts.

### CONCLUSIONS OF THE COURT

The court first notes that the only claim in this case is against the City. In *City of Canton*

*v. Harris*, 489 U.S. 378 (1989), the court stated that

> In *Monell v. New York City Dept. of Social Services*, 436 U.S. 658, 98 S.
> Ct. 2018, 56 L. Ed. 2d 611 (1978), we decided that a municipality can be found
> liable under § 1983 only where the municipality itself causes the constitutional
> violation at issue. *Respondeat superior* or vicarious liability will not attach under

19

§ 1983. *Id.*, at 694-695, 98 S. Ct. at 2037-38. "It is only when the 'execution of the government's policy or custom . . . inflicts the injury' that the municipality may be held liable under § 1983." *Springfield v. Kibbe*, 480 U.S. 257, 267, 107 S. Ct. 1114, 1119, 94 L. Ed. 2d 293 (1987) (O'CONNOR, J., dissenting) (quoting *Monell, supra*, 436 U.S., at 694, 98 S. Ct. at 2037-38).

Thus, our first inquiry in any case alleging municipal liability under § 1983 is the question whether there is a direct causal link between a municipal policy or custom and the alleged constitutional deprivation.

*Id.* at 385.[6] *Canton* further establishes that:

[T]here are limited circumstances in which an allegation of a "failure to train" can be the basis for liability under § 1983.

*Id.* at 387.

We hold today that the inadequacy of police training may serve as the basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact.

*Id.* at 388.

Only where a municipality's failure to train its employees in a relevant respect evidences a "deliberate indifference" to the rights of its inhabitants can such a shortcoming be properly thought of as a city "policy or custom" that is actionable under § 1983. As Justice BRENNAN's opinion in *Pembaur v. Cincinnati*, 475 U.S. 469, 483-484, 106 S. Ct. 1292, 1300-1301, 89 L. Ed.2d 452 (1986) (plurality) put it: "[M]unicipal liability under § 1983 attaches where--and only where--a deliberate choice to follow a course of action is made from among various alternatives" by city policymakers. *See also Oklahoma City v. Tuttle*, 471 U.S., at 823, 105 S. Ct., at 2436 (opinion of REHNQUIST, J.). Only where a failure to train reflects a "deliberate" or "conscious" choice by a municipality--a "policy" as defined by our prior cases--can a city be liable for such a failure under § 1983.

*Monell*'s rule that a city is not liable under § 1983 unless a municipal policy causes a constitutional deprivation will not be satisfied by merely alleging that the existing training program for a class of employees, such as police officers, represents a policy for which the city is responsible.

---

[6] In *Canton*, the defendant acknowledged that there was no dispute before the Supreme Court that the city's employees denied the plaintiff's constitutional right to receive medical care. *Id.* at 388-89 n.8. There is no such admission here.

*Id.* at 389.

The plurality opinion in *Tuttle* explained why this must be so:

> "Obviously, if one retreats far enough from a constitutional violation some municipal 'policy' can be identified behind almost any . . . harm inflicted by a municipal official; for example, [a police officer] would never have killed Tuttle if Oklahoma City did not have a 'policy' of establishing a police force. But *Monell* must be taken to require proof of a city policy different in kind from this latter example before a claim can be sent to a jury on the theory that a particular violation was 'caused' by the municipal 'policy.'" 471 U.S., at 823, 105 S. Ct., at 2436. *Cf. also id.*, at 833, n. 9, 105 S. Ct., at 2441, n.9 (opinion of BRENNAN, J.).

*Id.* at 389-90 n.9.

> But it may happen that in light of the duties assigned to specific officers or employees the need for more or different training is so obvious, and the inadequacy so likely to result in the violation of constitutional rights, that the policymakers of the city can reasonably be said to have been deliberately indifferent to the need. In that event, the failure to provide proper training may fairly be said to represent a policy for which the city is responsible, and for which the city may be held liable if it actually causes injury.

*Id.* at 390 (footnote omitted).

> Moreover, for liability to attach in this circumstance the identified deficiency in a city's training program must be closely related to the ultimate injury. Thus in the case at hand, respondent must still prove that the deficiency in training actually caused the police officers' indifference to her medical needs. Would the injury have been avoided had the employee been trained under a program that was not deficient in the identified respect?

*Id.* at 391 (footnote omitted).

In an opinion concurring in part and dissenting in part joined by Justices Scalia and

Kennedy, Justice O'Connor stated:

> I further agree that a § 1983 plaintiff pressing a "failure to train" claim must prove that the lack of training was the "cause" of constitutional injury at issue and that this entails more than simply showing "but for" causation. *Ante*, at 392.

21

Lesser requirements of fault and causation in this context would "open municipalities to unprecedented liability under § 1983," *ante*, at 391, and would pose serious federalism concerns. *Ante*, at 392.

*Id.* at 393.

The claim in this case--that police officers were inadequately trained in diagnosing the symptoms of emotional illness--falls far short of the kind of "obvious" need for training that would support a finding of deliberate indifference to constitutional rights on the part of the city. As the Court's opinion observes, *ante*, at 388-89, n. 8, this Court has not yet addressed the precise nature of the obligations that the Due Process Clause places upon the police to seek medical care for pretrial detainees who have been *physically* injured while being apprehended by the police. *See Revere v. Massachusetts General Hospital*, 463 U.S. 239, 246, 103 S. Ct. 2979, 2984, 77 L. Ed. 2d 605 (1983) (REHNQUIST, J., concurring). There are thus no clear constitutional guideposts for municipalities in this area, and the diagnosis of mental illness is not one of the "usual and recurring situations with which [the police] must deal." *Ante*, at 391. The lack of training at issue here is not the kind of omission that can be characterized, in and of itself, as a "deliberate indifference" to constitutional rights.

Second, I think municipal liability for failure to train may be proper where it can be shown that policymakers were aware of, and acquiesced in, a pattern of constitutional violations involving the exercise of police discretion. In such cases, the need for training may not be obvious from the outset, but a pattern of constitutional violations could put the municipality on notice that its officers confront the particular situation on a regular basis, and that they often react in a manner contrary to constitutional requirements. The lower courts that have applied the "deliberate indifference" standard we adopt today have required a showing of a pattern of violations from which a kind of "tacit authorization" by city policymakers can be inferred. *See, e.g., ... Languirand v. Hayden*, 717 F.2d 220, 227-228 (CA5 1983) (municipal liability for failure to train requires "evidence at least of a pattern of similar incidents in which citizens were injured or endangered"); *Wellington v. Daniels*, 717 F.2d 932, 936 (CA4 1983) ("[A] failure to supervise gives rise to § 1983 liability, however, only in those situations where there is a history of wide-spread abuse. Only then may knowledge be imputed to the supervisory personnel").

*Id.* at 396-98 (emphasis added).[7]

---

[7]The Eleventh Circuit has adopted similar reasoning. *See Young v. City of Augusta*, 59 F.3d 1160 (11th Cir. 1995):

First, the need for a particular type of training may be obvious where jailers face clear

22

The foregoing discussions denote the following elements which must be established by

the plaintiff before she can prevail in this case on her federal claim:

(1) That the City's employees committed a constitutional violation in not avoiding Corley's

suicide.

(2) That the employees' said violations were <u>caused</u> by a policy, practice, or custom brought

about by the deliberate indifference of the City's policy-makers to the rights of persons with

whom the police came into contact.

This court concludes that the plaintiff cannot prevail in this case for at least two reasons.

First, there was no constitutional violation by the City's employees. In *Popham v. City of*

*Talladega*, 908 F.2d 1561 (11th Cir. 1990), the court stated:

> This court recently held that to prevail under section 1983 for a constitutional
> violation of substantive due process, that "deliberate indifference" to the
> prisoner's taking of his own life must be displayed. *Edwards v. Gilbert*, 867 F.2d
> 1271, 1274-75 (11th Cir. 1989).  This is a difficult burden for a plaintiff to meet
> and becomes the key issue in this case.

*Id.* at 1563.

> . . . The standard requires a strong likelihood rather than a mere possibility
> that the self-infliction of harm will occur, *State Bank of St. Charles v. Camic*, 712
> F.2d 1140, 1146 (7th Cir. 1983), and will not be found to exist in the face of
> negligence only.  *Stewart v. Love*, 696 F.2d 43, 44 (6th Cir. 1982) (prison
> officials' mere negligence is insufficient to give rise to culpability under the

---

constitutional duties in recurrent situations. *See, e.g., id.* at 390 n. 10, 109 S. Ct. at 1205 n. 10, 103
L. Ed. 2d at 427 n. 10 (citing the obvious need to train officers with respect to the constitutional
limitations on the use of deadly force). Young's claims do not fit within this category. *See id.* at
396-97, 109 S. Ct. at 1209, 103 L. Ed. 2d at 432 (observing that contentions "that police officers
were inadequately trained in diagnosing the symptoms of emotional illness--falls far short of the
kind of 'obvious' need for training that would support a finding of deliberate indifference to
constitutional rights on the part of the city") (O'Connor, J., concurring in part and dissenting in
part).

*Id.* at 1172.

Eighth Amendment); *Molton v. City of Cleveland*, 839 F.2d 240, 243 (6th Cir. 1988), *cert. denied*, 489 U.S. 1068, 109 S. Ct. 1345, 103 L. Ed. 2d 814 (1989) (despite eight previous suicides, plaintiff showed mere negligence which does not establish a § 1983 claim). *Boyd v. Harper*, 702 F. Supp. 578 (E.D. Va.1988) (merely negligent conduct displayed by failure to respond to information that detainee was weeping in cell and by failure to basically "jail train" official in charge of classification interview).

      In the context of jail suicides, an allegation of deliberate indifference must be considered in light of the level of knowledge possessed by the officials involved, or that which should have been known as to an inmate's suicidal tendencies. *See, e.g., Freedman v. City of Allentown*, 651 F. Supp. 1046 (E.D. Pa.1987), *aff'd*, 853 F.2d 1111 (3rd Cir. 1988) (In this context, deliberate indifference must go hand in hand with knowledge of an impending suicide); *Estate of Cartwright v. City of Concord*, 618 F. Supp. 722, 728 (N.D. Cal.1985), *aff'd*, 856 F.2d 1437 (9th Cir. 1988) (suicide threat made under the influence of drugs or alcohol did not furnish jailers with reason to believe decedent was suicidal).

*Id.* at 1563-64.

      . . . The fact that he attempted to commit suicide two days earlier was unknown to the officials who arrested him and placed him in a holding cell. When plaintiff visited her husband earlier in the evening, she failed to give police officers and jail officials notice of her husband's recent attempted suicide, which further permitted officials to be without the slightest suspicion that Popham might attempt to take his life. Some form of knowledge of the danger is required to support a section 1983 action. *Camic*, 712 F.2d at 1146.

*Id.* at 1564.

      Absent knowledge of a detainee's suicidal tendencies, the cases have consistently held that failure to prevent suicide has never been held to constitute deliberate indifference. *Edwards*, 867 F.2d 1271 (11th Cir. 1989). *See also Francis v. Pike County*, 708 F. Supp. 170 (S.D. Ohio E.D.1988), *aff'd*, 875 F.2d 863 (6th Cir. 1989) (police officer's failure to remove belt with which detainee hanged himself did not subject defendants to liability in absence of evidence that should have made policeman aware of suicidal tendencies). Cases in which genuine issues of fact regarding constitutional violations have been found in connection with jail suicide presented facts which are not present here. *Cf., Cabrales v. County of Los Angeles*, 864 F.2d 1454 (9th Cir. 1988) (jailers rescued decedent from previous suicide attempt); *Partridge v. Two Unknown Police Officers*, 751 F.2d 1448 (5th Cir. 1985), *withdrawn*, 755 F.2d 1126 (5th Cir. 1985), *substituted opinion*, 791 F.2d 1182 (5th Cir. 1986) (it was known that

> decedent had attempted suicide in previous confinement); *Guglielmoni v.
> Alexander*, 583 F. Supp. 821 (D. Conn.1984) (after faked suicide, inmate hanged
> himself); *Matje v. Leis*, 571 F. Supp. 918 (S.D. Ohio 1983) (inmate's counsel
> informed jail officials of suicide threat).

*Id.* at 1564.  *See also Belcher v. City of Foley*, 30 F.3d 1390 (11th Cir. 1994).

The facts of this case do not rise to the level of even those in *Popham*.  Plaintiff suggests that the City's employees should have obtained a copy of the Cherokee County Booking Sheet.  That "Booking Sheet" specifically indicated that the booking officer did not feel that Corley was suicidal.  There was never a suggestion by anyone that he was suicidal.

Even if it were to be determined that the employees of the City committed a constitutional violation, there is no substantial evidence that the City was deliberately indifferent to the rights of the persons who came into contact with its employees with regard to matters at issue here.  Further, there is no substantial evidence that any policy, custom, or practice of the City was the cause of Corley's suicide.  There is no evidence that there had been "a pattern of violations" to alert the City.  After this incident, the City took corrective action.

Similar failure to train and other arguments were made in *Popham* as are made here.  The court stated:

> Mrs. Popham alleges liability related to the failure to train jail personnel to screen
> detainees for suicidal tendencies.  Similar contentions have been rejected by other
> courts: *Roberts v. City of Troy*, 773 F.2d 720 (6th Cir. 1985) (claim that decedent
> fit profile of high suicide risk which screening would have detected is insufficient
> to establish deliberate indifference).  *See also, Freedman*, 651 F. Supp. at 1048.
> The Supreme Court has held that inadequate police training may provide a basis
> for section 1983 liability only where failure to train amounts to deliberate
> indifference to the rights of persons with whom the police come into contact.
> *Canton v. Harris*, 489 U.S. 378, 109 S. Ct. 1197, 103 L. Ed. 2d 412 (1989).
>
> Plaintiff complains of the fact that there were no guards on duty for the
> last shift and the failure of the camera to cover the small area of the cell in which
> the decedent committed suicide, but cites no cases for the proposition that

25

deliberate indifference is demonstrated if prisoners are not seen by jailers at all times.

Nor can it be argued that a city policy not to prevent jail suicide was established by the mayor's decision to leave the night guard position unfilled during the last quarter of 1987, despite a suicide within the facility two weeks before Popham took his life. A single decision, made prior to the first suicide, does not represent a discernible city policy to maintain an inadequately staffed, non-suicide proof jail facility. *See Anderson*, 778 F.2d at 686-87 (to constitute a policy or custom, practice must be so well- settled that it shows a force of legislative pronouncement).

908 F.2d at 1564-65. *See also Cagle v. Sutherland*, ___ F.3d ___, 2003 WL 21398226 (11th Cir. June 18, 2003).

Although the case is covered by the Fourteenth Amendment rather than the Eighth Amendment, the applicable law is generally the same under both Amendments. *See Farmer v. Brennan*, 511 U.S. 825 (1994); *Haney v. City of Cumming*, 69 F.3d 1098 (11th Cir. 1995); *Belcher*, 30 F.3d at 1390; *Hofer v. City of Auburn*, 155 F. Supp. 2d 1308 (M.D. Ala. 2001).

Even if the City employees failed to follow the apparent policy of checking the prisoner at certain frequencies, that alone would not establish a City policy in the absence of a known pattern. It is clear that negligence alone, if it occurred, is not sufficient.

The court will **GRANT** the City's motion as to the federal claim(s). The court elects not to retain the state claims and will dismiss them without prejudice.

This _____ day of July, 2003.

ROBERT B. PROPST
**SENIOR UNITED STATES DISTRICT JUDGE**

26